# EXHIBIT A

July 10, 2017

Re: New Compensation Plan

Dear Larry:

Update Inc. (the "Company") is offering you the following new compensation plan as Chief Customer Officer, initially reporting to April Pish, President. Your anticipated effective date will be on or around 7/11/2017. This offer and your employment relationship will be subject to the terms and conditions of this letter.

Your base salary will be $120,000 per year, less applicable withholding, paid in accordance with Company's normal payroll practices. You will receive additional compensation by way of commission according to the following schedule on all commissionable sales that occur under your direction as determined by the Update:

| Staffing commission only | 15% Commissionable Margin | Commissionable Margin = billing for the month minus payroll, payroll taxes (15% of payroll) and, where applicable, direct project costs including a space charge. Space Charge Per Candidate (Boston $2.50 per hour, Miami $2.00 per hour, All Other Offices $3.00 per hour) |
|---|---|---|
| Staffing commission for monitoring of transferred accounts | 5% Commissionable Margin | |
| Low Margin Staffing commission (mark-up of 33% or below) | 7.5% Commissionable Margin | |
| e-Discovery | 3% of collected revenue* | |

*On eDiscovery sales, Employee will receive a $5,000.00 advance twice a month against future eDiscovery commissions.

**Staffing Client Approved & Paid Time Billed:** Employee agrees that if a client fails to pay for services rendered, Employee will not receive commission on the unpaid amounts. If commission was advanced on unpaid invoice(s), future commissions will be reduced by previously paid commissions. In addition, Commissions are paid in advance when services are performed based on the assumption that the client will pay their invoice timely. For those accounts which have invoices that are over 90 days old, commissions will be withheld for those specific invoices based on a standard commissionable margin. The withheld money will be 'paid back' to the Employee once that aged account receivable is collected.

**E-Discovery Client Approved & Paid Time Billed:** All commissions on sales involving discounts given by Account Executives, due to vended work or otherwise, are subject to approval by Update. This commission will be paid during the following month in which the sales collection event took place. Commissions will only be paid upon collection. For work performed not under an executed contract, commission due will be reduced by 50% for any amount collected beyond 120 days and 100% beyond 180 days from day of invoice

issue date. Upon termination, only revenue collected by the final date of employment will be paid. Any future adjustments in compensation, if any, will be made by Company at its sole and absolute discretion. This position is an exempt position, which means you are paid for the job and not by the hour. Accordingly, you will not receive overtime pay if you work more than 40 hours in a work week.

You will also be eligible for all fringe benefits available to other "full time" Company employees, including medical, dental and 401k benefits in accordance with Company's benefit plans. Company reserves the right to change or eliminate these benefits on a prospective basis at any time.

If you accept the new compensation plan, your employment with Company will be "at-will." This means your employment is not for any specific period of time and can be terminated by you at any time for any reason. Likewise, Company may terminate the employment relationship at any time, with or without cause or advance notice. In addition, Company reserves the right to modify your position or duties to meet business needs and to use discretion in deciding on appropriate discipline. Any change to the at-will employment relationship must be by a specific, written agreement signed by you and Company's President.

This offer is contingent upon the following:

- Signing Company's Employee Non-Disclosure Agreement (See enclosed);

This letter, including the enclosed Employee Non-Disclosure Agreement, constitutes the entire agreement between you and Company relating to this subject matter and supersedes all prior or contemporaneous agreements, understandings, negotiations or representations, whether oral or written, express or implied, on this subject. This letter may not be modified or amended except by a specific, written agreement signed by you and Company's President.

This offer will remain open until July 14, 2017. To indicate your acceptance of Company's offer on the terms and conditions set forth in this letter, please sign and date this letter in the space provided below and return it to me no later than until July 14, 2017.

If you have any questions, please feel free ask.

Sincerely,

April Pish
President
Update, Inc.

*** I have read this offer letter in its entirety and agree to the terms and conditions of employment. I understand and agree that my employment with Company is at-will.

Dated 7-12-17

Larry Samilow

EMPLOYEE NONDISCLOSURE AND ASSIGNMENT AGREEMENT

In return for my new or continued employment by Update, Inc. ("Company") and other good and valuable consideration, the receipt and sufficiency of which I hereby acknowledge, I acknowledge and agree that:

1. Best Efforts; No Conflict of Interest. During my employment with Company, I will devote my best efforts to the interests of Company and will not engage in other employment or in any activities determined by Company to be detrimental to the best interests of Company without the prior written consent of Company. I also agree to not engage in any work, paid or unpaid, that creates a conflict of interest with Company. If Company believes a conflict exists, Company may ask me to choose to discontinue the other work or resign my employment with Company. In addition, I agree that, during my employment with Company, I will not refer any client or potential client of Company to competitors of Company, without obtaining Company's prior written consent.

2. Prior Work. All previous work done by me for Company relating in any way to the conception, reduction to practice, creation, derivation, design, development, manufacture, sale or support of products or services for Company is the property of Company, and I hereby assign to Company all of my right, title and interest in and to such previous work.

3. Proprietary Information. My employment creates a relationship of confidence and trust between Company and me with respect to any information:

i. Applicable to the business of Company; or

ii. Applicable to the business of any client or customer of Company, which may be made known to me by Company or by any client or customer of Company, or learned by me in such context during the period of my employment.

All such information has commercial value in the business in which Company is engaged and is hereinafter called "Proprietary Information." By way of illustration, but not limitation, Proprietary Information includes any and all technical and non-technical information including patent, copyright, trade secret, and proprietary information, techniques, sketches, drawings, models, inventions, know-how, processes, apparatus, equipment, algorithms, software programs, software source documents, and formulae related to the current, future and proposed products and services of Company, and includes, without limitation, respective information concerning research, experimental work, development, design details and specifications, engineering, financial information, procurement requirements, purchasing manufacturing, customer lists, business forecasts, sales and merchandising and marketing plans and information. Proprietary Information

also includes proprietary or confidential information of any third party who may disclose such information to Company or to me in the course of Company's business. In cases where any question exists as to the appropriateness of disclosing information, I agree to obtain the prior written consent of Company prior to disclosure.

4. Ownership and Nondisclosure of Proprietary Information. All Proprietary Information is the sole property of Company, Company's assigns, and Company's customers, and Company, Company's assigns and Company's customers shall be the sole and exclusive owner of all patents, copyrights, mask works, trade secrets and other rights in the Proprietary Information. I hereby do and will assign to Company all rights, title and interest I may have or acquire in the Proprietary Information. At all times, both during my employment by Company and after termination of such employment, I will keep in confidence and trust all Proprietary Information, and I will not use or disclose any Proprietary Information or anything directly relating to Proprietary Information without the written consent of Company, except as may be necessary in the ordinary course of performing my duties as an employee of Company.

5. Innovations. As used in this agreement, the term "Innovations" means all processes, machines, manufactures, compositions of matter, improvements, inventions (whether or not protectable under patent laws), works of authorship, information fixed in any tangible medium of expression (whether or not protectable under copyright laws), moral rights, mask works, trademarks, trade names, trade dress, trade secrets, know-how, ideas (whether or not protectable under trade secret laws), and all other subject matter protectable under patent, copyright, moral right, mask work, trademark, trade secret or other laws, and includes without limitation all new or useful art, combinations, discoveries, formulae, manufacturing techniques, technical developments, discoveries, artwork, software, and designs. Innovations include "Inventions," which is defined to mean any inventions protected under patent laws.

6. Disclosure of Prior Innovations. I have identified on Exhibit A ("Prior Innovations") attached hereto all Innovations, applicable to the business of Company or relating in any way to Company's business or demonstrably anticipated research and development or business, which were conceived, reduced to practice, created, derived, developed, or made by me prior to my employment with Company (collectively, the "Prior Innovations"), and I represent that such list is complete. I represent that I have no rights in any such Innovations other than those Prior Innovations specified in Exhibit A. If there is no such list on Exhibit A, I represent that I have neither conceived, reduced to practice, created, derived, developed nor made any such Prior Innovations at the time of signing this agreement.

7. Assignment of Innovations; License of Prior Innovations. I hereby agree promptly to disclose and describe to Company, and I hereby do and will assign to Company or Company's designee my entire right, title, and interest in and to: (a) each of the Innovations (including Inventions), and any associated intellectual property rights, which I may solely or jointly conceive, reduce to practice, create, derive, develop or make during the period of my employment with Company, which either (i) relate, at the time of conception, reduction to practice, creation, derivation, development, or making of such Innovation, to Company's business or actual or demonstrably anticipated research or development, or (ii) were developed on any amount of Company's time or with the use of any of Company's equipment, supplies, facilities or trade secret information, or (iii) resulted from any work I performed for Company; and (b) each of the Innovations which is not an Invention (as demonstrated by me by evidence meeting the clear and convincing standard of proof), and any

associated intellectual property rights, which I may solely or jointly conceive, develop, reduce to practice, create, derive, develop, or make during the period of my employment with Company, which are applicable to the business of Company (collectively, the Innovations identified in clauses (a) and (b) are hereinafter the "Company Innovations"). To the extent any of the rights, title and interest in and to the Company Innovations cannot be assigned by me to Company, I hereby grant to Company an exclusive, royalty-free, transferable, irrevocable, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to practice such non-assignable rights, title and interest. To the extent any of the rights, title and interest in and to Company Innovations can be neither assigned nor licensed by me to Company, I hereby irrevocably waive and agree never to assert such non- assignable and non-licensable rights, title and interest against Company or any of Company's successors in interest to such non-assignable and non-licensable rights. I hereby grant to Company or Company's designees a royalty free, irrevocable, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to practice all applicable patent, copyright, moral right, mask work, trade secret and other intellectual property rights relating to any Prior Innovations which I incorporate, or permit to be incorporated, in any Company Innovations. Notwithstanding the foregoing, I agree that I will not incorporate, or permit to be incorporated, any Prior Innovations in any Company Innovations without Company's prior written consent.

8.  Future Innovations. I recognize that Innovations or Proprietary Information relating to my activities while working for Company and conceived, reduced to practice, created, derived, developed, or made by me, alone or with others, within three (3) months after termination of my employment may have been conceived, reduced to practice, created, derived, developed, or made, as applicable, in significant part while employed by Company. Accordingly, I agree that such Innovations and Proprietary Information shall be presumed to have been conceived, reduced to practice, created, derived, developed, or made, as applicable, during my employment with Company and are to be promptly assigned to Company unless and until I have established the contrary by written evidence satisfying the clear and convincing standard of proof.

9.  Cooperation in Perfecting Rights to Proprietary Information and Innovations.

i.  I agree to perform, during and after my employment, all acts deemed necessary or desirable by Company to permit and assist Company, at Company's expense, in obtaining and enforcing the full benefits, enjoyment, rights and title throughout the world in the Proprietary Information and Innovations assigned or licensed to, or whose rights are irrevocably waived and shall not be asserted against, Company under this agreement. Such acts may include, but are not limited to, execution of documents and assistance or cooperation (i) in the filing, prosecution, registration, and memorialization of assignment of any applicable patents, copyrights, mask work, or other applications, (ii) in the enforcement of any applicable patents, copyrights, mask work, moral rights, trade secrets, or other proprietary rights, and (iii) in other legal proceedings related to the Proprietary Information or Innovations.

ii. In the event that Company is unable for any reason to secure my signature to any document required to file, prosecute, register, or memorialize the assignment of any patent, copyright, mask work or other applications or to enforce any patent, copyright, mask work, moral right, trade secret or other proprietary right under any Proprietary Information (including improvements thereof) or any Innovations (including derivative works, improvements, renewals, extensions, continuations, divisionals, continuations in part, continuing patent applications, reissues, and reexaminations thereof), I hereby irrevocably designate and appoint Company and Company's duly authorized officers and agents as my

agents and attorneys-in-fact to act for and on my behalf and instead of me, (i) to execute, file, prosecute, register and memorialize the assignment of any such application, (ii) to execute and file any documentation required for such enforcement, and (iii) to do all other lawfully permitted acts to further the filing, prosecution, registration, memorialization of assignment, issuance, and enforcement of patents, copyrights, mask works, moral rights, trade secrets or other rights under the Proprietary Information, or Innovations, all with the same legal force and effect as if executed by me.

10.  Nonassignable Inventions. I acknowledge that this agreement does not require that I assign or offer to assign to Company any invention that I developed entirely on my own time without using Company's equipment, supplies, facilities, or trade secret information except for those inventions that: (a) relate at the time of conception or reduction to practice of the invention to Company's business, or actual or demonstrably anticipated research or development of Company; (b) result from any work that I performed for Company; or (c) apply to any patent or invention covered by a contract between Company and the United States or any of its agencies requiring full title to such patent or invention to be in the United States. Notwithstanding the above, I agree to disclose promptly in writing to Company all Innovations (including Inventions) conceived, reduced to practice, created, derived, developed, or made by me during the term of my employment and for three (3) months thereafter, whether or not I believe such Innovations are subject to this agreement, to permit a determination by Company as to whether or not the Innovations should be the property of Company. Any such information will be received in confidence by Company.

11.  Return of Company Property. I acknowledge that all materials (including, without limitation, documents, drawings, models, apparatus, sketches, designs, lists, and all other tangible media of expression) furnished to me by Company shall remain the property of Company. On termination of my employment with Company for whatever reason, or at the request of Company before termination, I agree to promptly deliver to Company all records, files, computer disks, memoranda, documents, lists, materials and other information regarding or containing any confidential or Proprietary Information, including all copies, reproductions, summaries or excerpts thereof, then in my possession or control, whether prepared by me or others. I also agree to promptly      return, upon termination or at any time upon Company's request, any and all Company property issued to me, including but not limited to computers, facsimile transmission equipment, cellular phones, keys and credits cards. I further agree that should I discover any Company property or Proprietary Information in my possession after my termination and departure from Company, I agree to return it promptly to Company without retaining copies or excerpts of any kind.

12.  Non-solicitation.

a.  Non-solicitation of Customers or Prospects. I acknowledge that information about the Company's customers and customer prospects is confidential competitive information and constitutes a valuable trade secret. Accordingly, I agree that during the term of this agreement and for a period of one (1) year after my employment ends, I will not, either directly or indirectly, separately or in association with others, solicit or encourage others to solicit any of the Company's customers or customer prospects located within fifty (50) miles of any office, branch office, or production facility of the Company or with whom I had any contact during the term of my employment for the purpose of diverting or taking away business from Company.

b.  Non-solicitation of Company's Employees. I acknowledge that information about the Company's employees is confidential competitive information and constitutes a trade secret. Accordingly, I agree that during the term of this agreement and for a period of one (1) year after my employment ends, I will not, either directly or indirectly, separately or in association with others, solicit or encourage others to solicit or attempt to hire any of the Company's employees or cause others to solicit or encourage any of Company's employees to discontinue their employment with Company.

13.  Covenant Not to Compete. In recognition of: (1) the substantial time, money and effort expended by the Company in the development of its confidential and proprietary information; (2) the fact that I will have access to and be personally entrusted with such confidential and proprietary information during my employment with the Company; (3) the high degree of competition in the electronic data discovery, litigation support, imaging, scanning, hardcopy graphics and photocopying services business; and (4) the special knowledge and expertise that I will develop as a result of my employment with the Company; I agree that during the term of my employment with Company, and for one (1) year after my employment ends for any reason, I will not directly or indirectly compete with Company by providing to another person or entity in competition with Company (defined below) the same or similar services as those that I provided to the Company during the term of my employment with Company. For purposes of this agreement, a person or entity is in competition with the Company if it provides legal staffing, managed review, legal consulting, information governance, electronic data discovery and litigation support services within fifty (50) miles of any office, branch office, or production facility of the Company, with the exception of any person or entity listed below as a "Prior Relationship". This covenant not to compete is limited to the types of activities and services included within my Job Description described in my offer letter. As such, I acknowledge and agree that these restrictions allow me an adequate number and variety of employment alternatives, based on my varied skills and abilities. I represent that I am willing and able to compete in other employment in the electronic data discovery, litigation support and photocopying industries provided that such employment does not involve me providing the same services I provided to the Company to a person or entity in competition with the Company (defined above). I represent and agree that the restrictions on competition, as to time, geographic area, and scope of activity are reasonable, do not impose a greater restraint than is necessary to protect the goodwill and business interests of the Company, and are not unduly burdensome to me.

a.  The provisions of this Paragraph 13 shall be severable, and if any of them is held invalid because of its duration, scope of area or activity, or any other reason, the parties agree that such provision shall be adjusted or modified by the court to the extent necessary to cure that invalidity, and the modified provision shall be enforceable as if originally made in this agreement.

b.  The real or perceived existence of any claim or cause of action against the Company, whether predicated on this agreement or some other basis, shall not relieve me of my obligations under this agreement, and shall not constitute a defense to the enforcement by the Company of the restrictions and covenants contained herein.

14.  Disclosure of Prior Relationships. I have identified on Exhibit B ("Prior Relationships") attached hereto all persons or entities in competition with Company (defined above) with whom I have a "Prior Relationship", defined as any person or entity with whom I previously have been employed or provided services as an independent contractor for a cumulative period of two (2) years or more within the past five (5) calendar years, and I represent that such list is complete. I

represent that I have no Prior Relationships other than those specified in Exhibit B. If there is no such list on Exhibit B, I represent that I have no Prior Relationships at the time of signing this agreement.

15. No Violation of Rights of Third Parties. I warrant that my performance of all the terms of this agreement and my employment with Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me prior to my employment with Company. I agree not to disclose to Company, or induce Company to use, any confidential or proprietary information or material belonging to any previous employers or others. I warrant that I am not a party to any other agreement that will interfere with my full compliance with this agreement or any other agreement that I may have with Company. I further agree not to enter into any agreement, whether written or oral, in conflict with the provisions of this agreement or any other agreement that I may have with Company.

16. Survival. This agreement: (a) shall survive my employment by Company; (b) does not in any way restrict my right or the right of Company to terminate my employment at any time, for any reason or for no reason; (c) inures to the benefit of successors and assigns of Company; and (d) is binding upon my heirs and legal representatives.

17. Injunctive Relief. A breach of any of the promises or agreements contained herein will result in irreparable and continuing damage to Company for which there will be no adequate remedy at law, and Company shall be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including monetary damages if appropriate).

18. Notices. Any notice required or permitted by this agreement shall be in writing and shall be delivered as follows, with notice deemed given as indicated: (a) by personal delivery, when delivered personally; (b) by overnight courier, upon written verification of receipt; (c) by telecopy or facsimile transmission, upon acknowledgment of receipt of electronic transmission; or (d) by certified or registered mail, return receipt requested, upon verification of receipt. Notices to me shall be sent to any address in Company's records or such other address as I may specify in writing. Notices to Company shall be sent to Company's Human Resources Department or to such other address as Company may specify in writing.

19. Governing Law. This agreement shall be governed in all respects by the laws of the United States of America and by the laws of the Commonwealth of Virginia. Each of the parties irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in Virginia, as applicable, for any matter arising out of or relating to this agreement, except that in actions seeking to enforce any order or any judgment of such federal or state courts located in Virginia, such personal jurisdiction shall be nonexclusive.

20. Severability. If any provision of this agreement is held by a court of law to be illegal, invalid or unenforceable, (i) that provision shall be deemed amended to achieve as nearly as possible the same economic effect as the original provision, and (ii) the legality, validity and enforceability of the remaining provisions of this agreement shall not be affected or impaired thereby.

21. **Waiver; Amendment; Modification.** The waiver by Company of a term or provision of this agreement, or of a breach of any provision of this agreement by me, shall not be effective unless such waiver is in writing signed by Company. No waiver by Company of, or consent by Company to, a breach by me, will constitute a waiver of, consent to or excuse of any other or subsequent breach by me. This agreement may be amended or modified only with the written consent of both me and Company. No oral waiver, amendment or modification shall be effective under any circumstances whatsoever.

22. **Assignment.** This agreement may be assigned by the Company without my prior written consent.

23. **Entire Agreement.** This agreement represents my entire understanding with Company with respect to the subject matter of this agreement and supersedes all previous understandings, written or oral.

I certify and acknowledge that I have carefully read all of the provisions of this Employee Nondisclosure and Assignment Agreement and that I understand and will fully and faithfully comply with such provisions.

Update, Inc.:  Employee:

By: _[signature]_  By: _[signature]_

Title: President  Printed Name: Larry R. Samilow

Dated: 7-12-17  Dated: 7-12-17

**Exhibit B**

LIST OF PRIOR RELATIONSHIPS

1.

2.

3.

4.

5.

X  No Prior Relationships

___ Additional Sheets Attached

Larry R. Samilov
Print Name of Employee

Date: 7-12-17

[signature]
Signature of Employee

## Exhibit A
### LIST OF PRIOR INNOVATIONS AND ORIGINAL WORKS OF AUTHORSHIP

1.

2.

3.

4.

5.

X  No inventions or improvements

___ Additional Sheets Attached

_Larry F. Samilou_
Print Name of Employee:

Date: 7-12-17

[signature]
Signature of Employee

Case 1:18-cv-00462-TSE-JFA   Document 1-1   Filed 04/20/18   Page 12 of 13 PageID# 24



As a Chief Customer Officer you will be responsible for creating interest, developing opportunities, managing client relationships and, most importantly, driving revenue by closing business with decision makers at corporations and law firms. Chief Customer Officer will be able to sell across Update Legal's entire service portfolio to include consultation of legal departments and legal spend.

**Job Duties and Responsibilities:**

- Create a strategic client development plan managing the process from inception to sale of service
- Create product presentations to market and sell Update Legal's services
- Identify opportunities for services that will lead to an increase in sales.
- Define long term strategies to maintain and increase sales and close deals
- Leverage senior-level employees and subject matter experts where appropriate to help drive the sales cycle.
- Present to and consult with C-level clients on business trends with a view towards developing services, products, and distribution channels.
- Create and distribute weekly sales reports and track activity on accounts
- Ensure client satisfaction, improve client retention, and develop growth opportunities within existing accounts by managing communications, strengthening relationships, and effectively resolving issue

**Job Requirements**

- Extensive knowledge of Business Development
- Demonstrated success in account management and sales
- Be a team player, yet have the ability to work independently and possess excellent time management, organizational and presentation skills
- Possess excellent verbal and written communication skills
- Knowledge of the legal industry and/or e-discovery industry is considered a plus

*L.RS*
*7-12-17*

*AAP*
*7-12-17*