IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | |
|---|---|
| UPDATE, INC., | |
| _Plaintiff,_ | Civil Action No. 1:18-cv-462 |
| v. | |
| LAWRENCE SAMILOW | |
| _Defendant._ | |

## PLAINTIFF UPDATE, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Update, Inc. – a/k/a Update Legal – ("Update") seeks a preliminary injunction pursuant to Fed. R. Civ. P. 65 to immediately enjoin Defendant Lawrence Samilow ("Samilow"), individually or through Samilow Harvest Group, LLC or any other person, pending a determination of the relief requested in its Verified Complaint, from: (1) soliciting or otherwise diverting Update's customers in violation of Samilow's Non-solicitation covenant with Update for the 1-year restricted period; (2) unlawfully competing against Update in the future during such restricted period in violation of his Covenant Not to Compete with Update; and (3) disclosing, using or allowing to be used, any of Update's related confidential information. The foregoing requested relief is necessary to protect Update from suffering irreparable harm.

## INTRODUCTION

Defendant Samilow is the former well-paid Chief Customer Officer of Update, an eDiscovery, legal staffing, and litigation support firm. He voluntarily entered into reasonable Non-solicitation and Covenant Not to Compete agreements with his former employer, received

the benefits thereunder, and now inexplicably refuses to honor his agreement or respond in any way to Update's repeated attempts to get him to comply with these covenants.

For over 22 years, Update employed Samilow and provided him a platform to service and develop Update clients based on Update's investment and goodwill. Update gave Samilow access to Update's customers and targets, along with confidential information regarding Update's customers and legal staffing plans and strategies. Samilow benefited from Update's goodwill, including its operating history and industry leading reputation, and professional resources.

To protect Update's investment in Samilow, Update asked him to execute a reasonable restrictive covenant agreement in exchange for increased compensation and following his promotion as Update's Chief Customer Officer – a position that put Samilow in charge of Update's entire sales team and clients. Samilow agreed to the non-solicitation and non-compete covenants in the agreement, which required him, among other things, for a period of twelve months following his employment, to refrain from soliciting or encouraging others to solicit Update's customers for the purpose of diverting or taking away business from Update and to refrain from competing with Update.

Upon resigning in January 2018, Samilow brazenly informed Update's affiliate, Driven, Inc., of his proposal to transition all staffing and e-discovery technology clients he had been servicing to a "soon-to-be-formed consulting practice." Following his resignation, Samilow has now acted on that threat, necessitating this motion for preliminary injunctive relief.

Update first learned that Samilow had in fact solicited Update customer Lowenstein Sandler LLP ("Lowenstein Sandler"). While this solicitation did not apparently lead to the loss of such customer for the time being, Samilow's more recent solicitations and actions have

2

actually resulted in diversion of work away from Update in two instances: on an ongoing large eDiscovery project for Update customer, Teligent, Inc. ("Teligent"), and a legal staffing project for Update customer, Porzio, Bromberg & Newman ("Porzio"). Samilow had worked with both Teligent and Porzio while employed at Update, and Samilow's solicitation and diversion of these customers plainly violate his non-solicitation and non-compete covenants with Update.

Samilow also has breached his restrictive covenants by founding and forming Samilow Harvest Group, LLC ("Samilow Harvest") in Roseland, New Jersey, an entity now performing the same eDiscovery, staffing/placement, and information governance and related consulting services provided by Update and which he sold for Update. Samilow Harvest Group is the vehicle through which Samilow has diverted Update's work for Teligent and successfully solicited work from Porzio. The operation of this competing entity within the 50-mile restricted area of Update's New York office violates Samilow's 1-year Covenant Not to Compete.

Update fulfilled all of its obligations in this employment relationship, including compensating Samilow with a six-figure salary, plus commissions. In turn, Update seeks to require Samilow to abide by the eminently reasonable non-solicitation and non-compete restrictions to which he voluntarily agreed. His breaches have caused and will continue to cause Update irreparable harm due to his solicitation of Update customers, diversion of important Update clients and projects, and unlawful competition.

## FACTUAL BACKGROUND

### A.    Update's Business

Since entering the marketplace in 1991, Update has established itself as a leading provider of legal staffing, eDiscovery, litigation support, and information governance services throughout the United States. (Declaration of April Pish ("Pish Decl.") ¶¶ 3–4), attached hereto as Exhibit A. Update provides a range of these services to its customers, which include law

3

firms and other commercial firms. (*Id.*). The various types of eDiscovery and litigation support services Update provides includes legal staffing and attorney placement, document collection and legal holds, forensics, processing, managed review, hosted review, technology assisted review. (*Id.* ¶¶ 3-5).

Update has several competitors, but maintains a competitive edge over those other companies through, among other things, its years of service and industry leading reputation and its highly experienced personnel. (*Id.* ¶ 6). Update's success also is attributable to its ability to attract new clients and retain existing clients for multiple matters and over the long term. (*Id.* ¶¶ 7-8). Update's client relationships were developed through its substantial investment both financially and in terms of personnel. (*Id.* ¶ 16). Given the considerable time and expense to acquire new clients, Update's business strategy focuses on working with clients over a long period of time on multiple matters, rather than on an ad-hoc basis. (*Id.* ¶ 7). For example, Update maintains a 71% customer retention rate over the past four years. (*Id.* ¶ 8).

## B. Samilow's Restrictive Covenants with Update.

Update hired Samilow — a non-lawyer — in 1995. (Pish Decl. ¶ 11). Samilow did not join Update with any "book of business" or clients, and his success at Update was dependent in large part on his ability to use Update's platform, reputation, and resources to expand and service Update's existing client relationships and to develop new ones. (*Id.* ¶ 13–15). Samilow eventually became Update's Chief Customer Officer, a senior executive role that made him ultimately responsible at the company for creating interest, developing opportunities, managing client relationships, and driving revenue by closing business with decision makers at corporations and law firms. (*Id.* ¶ 14). In this position, Mr. Samilow sold Update's entire services portfolio of eDiscovery, legal staffing, and managed review and information governance solutions and was responsible for Update's entire sales team and clients. (*Id.*) Among numerous

4

other clients, Samilow serviced key Update clients Lowenstein Sandler, Teligent, and Porzio during his employment. (*Id.* ¶¶ 23, 30, 35).

In 2017, following Samilow's promotion to Chief Customer Officer and as part of his increase in compensation, Samilow agreed to an Employee Nondisclosure and Assignment Agreement (the "Agreement") with Update. (*Id.* ¶ 18, Ex. 1). His Agreement – governed by Virginia law[1] – contains a non-solicitation covenant governing Update's customers, which provides:

> Non-solicitation of Customers or Prospects. I acknowledge that information about [Update's] customers and customer prospects is confidential competitive information and constitutes a valuable trade secret. Accordingly, I agree that during the term of this agreement and for a period of one (1) year after my employment ends, I will not, either directly or indirectly, separately or in association with others, solicit or encourage others to solicit any of [Update's] customers or customer prospects located within fifty (50) miles of any office, branch office, or production facility of the [Update] or with whom I had any contact during the term of my employment for the purpose of diverting or taking away business from [Update].

(*Id.*, Ex. 1 at 12(a)).

In addition to the Non-solicitation provision, the Agreement contains a Covenant Not to Compete, which provides, in pertinent part:

> I agree that during the term of my employment with Company, and for one (1) year after my employment ends for any reason, I will not directly or indirectly compete with Company by providing to another person or entity in competition with Company (defined below) the same or similar services as those that I provided to the Company during the term of my employment with Company. For purposes of this agreement, a person or entity is in competition with the Company if it provides legal staffing, managed review, legal consulting, information governance, electronic data discovery and litigation support services within fifty (50) miles of any office, branch office, or production facility of the Company, with the exception of any person or entity listed below as a "Prior Relationship".

---

[1] The Agreement contains provisions selecting Virginia law as the governing law and designating the state and federal courts in Virginia as the exclusive forums for any disputes arising under the Agreement. (Pish Decl., Ex. 1 at § 19).

> This covenant not to compete is limited to the types of activities and services included within my Job Description described in my offer letter.

(*Id.*, Ex. 1 at § 13).

The Agreement also prohibits Samilow from engaging in any unauthorized use or disclosure of Update's or its clients' confidential information. (*Id.* Ex. 1 at § 4).

Samilow understood the restrictions to which he voluntarily agreed in exchange for considerable compensation and opportunities at Update. Samilow also expressly agreed that a breach of the non-solicitation and non-compete covenants will result in "irreparable and continuing damage" to Update. (*Id.*, Ex. 1 at § 17).

### C.   Samilow Resigns to Form Competing Company and Begins Soliciting Update's Clients

Samilow resigned on January 10, 2018. Around this time he conveyed a "proposal" whereby he would transition certain legal staffing and e-Discovery technology engagements to his "soon-to-be-formed" consulting practice. (Pish Decl. ¶¶ 23–24). Updated rejected such offer and never authorized Samilow to do that. (Id. ¶ 24.) Update nevertheless shortly thereafter learned from monitoring his former Update e-mail account that Samilow had contacted and solicited Update client Lowenstein Sandler. (*Id.* ¶¶ 25–26). In response, counsel for Update sent Samilow a letter on January 12, 2018, reminding him of his Non-solicitation obligations and demanding that he cease and desist. (*See* Declaration of Brandon H. Elledge ("Elledge Decl."), ¶ 3, attached hereto as Exhibit B.) While Samilow did not respond to this cease and desist letter, (*Id.* ¶ 4), Update did not detect further solicitation activity at the time, and did not apparently lose business from Lowenstein Sandler.

Update later learned, however, that Samilow had indeed formed his own competing consulting practice, Samilow Harvest Group, an LLC which advertises itself as performing eDiscovery, legal staffing/interim attorney placement, and information governance in

6

competition with Update and the same such services that Samilow marketed and sold on behalf of Update during his employment.  (Pish Decl. ¶ 29).  *See* https://samilowharvest.com/, (Compl., Ex. B.).

And, Update eventually discovered that Samilow had undertaken unlawful competitive and solicitation activities involving Update clients through Samilow Harvest Group.  While still at Update, Samilow had worked on a large eDiscovery project for Teligent, Inc. (Pish Decl. ¶ 30).  In April 2018, Teligent informed Update that it was cancelling the engagement and transferring the work to another company. (*Id.* ¶¶ 30–31).  Update has since learned that Samilow and Samilow Harvest Group are servicing the project in some capacity and that Mr. Samilow helped divert the project from Update. (*Id.*). Update also recently discovered that Samilow and Samilow Harvest Group are now engaged on a staffing project by Porzio, a client Update had serviced on multiple projects since 1999. (*Id.* ¶¶ 32–35).  Samilow Harvest Group is currently staffing that matter with three contract attorneys who Update has frequently worked with since 2007 and whose identities and associated proprietary information were accessible to Samilow during his employment at Update. (*Id.* ¶ 33–34; *see* Declaration of Amoy Williams ("Williams Decl."), ¶¶ 4-7, attached hereto as Exhibit C.)

In response to the discovery involving the diversion of its Teligent customer and the formation of the competing Samilow Harvest Group entity, Update, again through counsel, wrote to Samilow to demand that he stop such unlawful activity or else face litigation. (Elledge Decl. ¶ 5).  Samilow failed to respond at all to Update's counsel's April 3, 2018 notice, despite demand. (*Id.* ¶ 6).

Samilow has thus diverted business from Update, causing Update to suffer irreparable harm to its long-standing client relationships and goodwill, indeed, the same goodwill that

7

allowed Samilow to flourish at Update in the first place. (Pish. ¶ 36). This is especially true because Update strategically relies on repeat business and strong customer relationships. (*Id.* ¶¶ 7-8). If not enjoined, Samilow will continue to cause Update to lose Porzio, Teligent, and other valuable clients. (*Id.* ¶ 36).

## ARGUMENT

Update seeks a preliminary injunction enforcing the terms of Samilow's Non-solicitation covenant and Covenant Not to Compete in order to enjoin Samilow, directly or indirectly, individually or through Samilow Harvest Group or other parties, from: (a) providing any future competing services, for the restricted 1-year period, to Porzio, Teligent or other customers or entities that are the same or similar to those services that Samilow performed at Update; (b) further soliciting or encouraging others to solicit, for the restricted 1-year period, Porzio, Teligent and any other Update customer or prospect with whom Defendant Samilow had contact for the purpose of diverting or taking away business from Update; and (c) accessing or using any Update confidential information, including but not limited to client information or lists of contacts of potential legal staffing candidates.

A party seeking a preliminary injunction must demonstrate that (1) it is likely to succeed on the merits of its case; (2) it is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of the equities tips in its favor; and (4) an injunction would be in the public interest. *Real Truth About Obama, Inc. v. Fed. Election Com'n*, 575 F.3d 342, 346 (4th Cir. 2009) *reinstated on remand* 607 F.3d 355 (4th Cir. 2010) (*citing Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Update satisfies each of these requirements.

**I.      Update is likely to succeed on the merits of its breach claim.**

After receiving and refusing to respond to two cease and desist notices, there is no real dispute that Samilow, individually and through Samilow Harvest Group, does not intend to comply with his non-solicitation and non-compete covenants. Therefore, the Court need only find that these two covenants are enforceable to determine Update's likelihood of success on its claim for breach of the Agreement.[2] As discussed below, Samilow's Non-solicitation provision and Covenant Not to Compete plainly are enforceable because he received adequate consideration in exchange for this post-employment restriction and the covenant is narrowly tailored to protect Update's legitimate business interest in its customer relationships and its confidential and competitively sensitive customer information.

**A.    The non-solicitation and non-compete covenants are enforceable.**

**1.    The restrictive covenants are supported by adequate consideration.**

It is well established that sufficient consideration exists for restrictive covenants where, as here, such agreements are entered into as a condition of continued employment and access to confidential information and in exchange for increased employee compensation. *See Paramount Termite Control Co. v. Rector*, 380 S.E.2d 922, 926 (Va. 1989); *overruled on other grounds* by *Home Paramount Pest Control Cos. v. Shaffer*, 718 S.E.2d 762 (Va. 2011)).[3]

**2.    The non-solicitation and non-compete covenants are reasonable and thus enforceable.**

The three-part test for enforcement of employment restrictive covenants is well settled: the Court must determine "[b]ased on evidence presented … whether a restraint [1] 'is narrowly

---

[2] Under Virginia law, the elements of a breach of contract claim are: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 267 Va. 612, 619 (2004).

[3] Samilow also expressly agreed that the terms of his Agreement "shall survive [his] employment" and "does not in any way restrict [his] right or the right of [Update] to terminate [his] employment at any time, for any reason or no reason." (Agreement § 16(a)-(b).)

9

drawn to protect the employer's legitimate business interest, [2] is not unduly burdensome on the employee's ability to earn a living, and [3] is not against public policy.'" *Assurance Data, Inc. v. Malyevac*, 286 Va. 137, 144 (2013) (citations omitted) (noting that restrictive covenants are not viewed "in a factual vacuum" and reversing dismissal of customer non-solicitation and non-compete clause-based action where trial court had not permitted party to present evidence to demonstrate the three-part test); *see O'Sullivan Films v. Neaves*, 2017 WL 4798997, at *8 (W.D. Va. Oct. 24, 2017) (observing "that *Assurance Data* forecloses facial attacks on restrictive covenants").

i.   **The Non-solicitation and Non-Compete Covenants are Narrowly Tailored to Protect Update's Legitimate Business Interests.**

Under governing Virginia law, protectable interests no doubt include customer contacts, protection from detrimental competition, and protection of confidential information. *See, e.g.*, *Blue Ridge Anesthesia & Critical Care, Inc. v. Gidick*, 239 Va. 369, 372 (1990); *Worrie v. Boze*, 191 Va. 916, 62 S.E. 2d 876, 882 (1951); *Roanoke Eng'g Sales Co. v. Rosenbaum*, 223 Va. 548, 552, (1982). Where, as here, Update provides professional services and its Agreement is necessary to protect its customer relationships and related confidential information and is limited in time and scope, courts regularly find such restrictive covenants enforceable. *See Blue Ridge Anesthesia*, 239 Va. 369 at 372, 389 S.E.2d at 469 (1990) (enforcing covenant where "[b]ecause of the competitive nature of Blue Ridge's business, the contacts of these former employees with Blue Ridge's customers could adversely affect Blue Ridge's efforts to continue its business with those customers"); *Capital One Fin. Corp. v. Kanas*, 871 F. Supp. 2d 520, 533–34 (E.D. Va. 2012) ("When an employee, 'by leaving, threatens to siphon off the former employer's customers or goodwill, the law typically permits greater restrictions to be imposed by contract....'") (quoting 6 Williston on Contracts § 13:13 (4th ed.)). Indeed, Samilow's recent contacts with at least two of

10

Update's customers, Teligent and Porzio, already has "adversely affected" Update's continued work with such customers, and his prior efforts to solicit Lowenstein Sandler for competing work at least threatens to do the same. (*See* Pish Decl. ¶¶ 24–26, 30–35).

Moreover, Samilow is likely using Update's legal staffing contacts to recruit resources to staff projects for Samilow Harvest Group. (Pish Decl. ¶¶ 33–34). As Update's Chief Customer Officer, he was provided access to these protected lists and other Update sensitive business information, including, but not limited to, its staffing and recruiting contacts, business development strategies, and target customers – all of which are critical in the competitive eDiscovery and litigation support industry. (*Id.* ¶¶ 14-17). For that reason, Samilow acknowledged in his non-solicitation covenant that such information "about the Company's customers and customer prospects is confidential competitive information and constitutes a valuable trade secret." (Agreement § 12(a).) Virginia courts have consistently recognized a company's legitimate business interest in protecting these types of confidential information. *See, e.g., Comprehensive Techs. Int'l, Inc. v. Software Artisans, Inc.,* 3 F.3d 730, 738–39 (4th Cir. 1993), *vacated pursuant to settlement,* (citing *Stoneman v. Wilson,* 169 Va. 239, 192 S.E. 816 (1938) (an employee's knowledge "tends to give an element of reasonableness to a contract that the employee will not engage in a similar business for a limited time after the termination of his employment, and is always regarded as a strong reason for upholding the contract") and *Meissel v. Finley,* 198 Va. 577, 95 S.E.2d 186 (1956) ( "[P]ossession of trade secrets and confidential information is an 'important consideration' in testing the reasonableness of a restrictive covenant")).

Accordingly, Update clearly has a legitimate interest in protecting its customer relationships and associated confidential information here.

#56387085_v3

### ii.     The scope of the restrictive covenants are narrowly drawn.

In determining whether an employer has met its burden in enforcing a covenant, Virginia courts "consider the 'function, geographic scope, and duration' elements of the restriction'" and "'assess these elements together rather than as distinct inquiries.'" *Assurance Data*, 286 Va. at 144 (citations omitted).  Samilow's non-solicitation covenant in section 12 of this Agreement is narrowly drawn in compliance with Virginia law by duration, geography, Samilow's relationships with Update's customers, and only to matters that compete with and divert from Update's business. The non-compete covenant in section 13 of the Agreement applies the same limited duration and geographic scope, and is similarly limited to the services that only Samilow himself performed for Update.

The 12-month period in both covenants is shorter than other covenants that Virginia courts consistently have upheld. *See, e.g.*, *Blue Ridge Anesthesia*, 239 Va. 369  (three years); *Roanoke Eng'g*, 223 Va. 548 (three years); *Hair Club for Men, LLC v. Ehson*, 2016 WL 4577019, at *5–6 (E.D. Va. Aug. 31, 2016) (two years).  This one-year duration is particularly reasonable here, where Update substantially invests in obtaining and retaining customers and given the above-noted protectable customer relationships.  (Pish Decl. ¶¶ 7-8, 16).  Update needs this reasonable period of time to ensure that it can retain the customers that it spent significant resources to develop, without interference from Samilow.  And, because of Samilow's ongoing violation of the non-solicitation and non-compete covenants, the Court should prospectively enforce the one-year duration from the date of its Injunction Order to appropriately provide Update the protection that it bargained for in its Agreement with Samilow. *See Roanoke Eng'g*, 223 Va. at 555–556 (1982); *Hair Club for Men, LLC v. Ehson*, 2016 WL 6780310, at *4–5 (E.D. Va. Nov. 14, 2016).

12

With respect to geographic scope, as an initial matter, Samilow was based out of Update's New York City headquarters and often serviced clients near there and his home in New Jersey. (Pish Decl. ¶ 12). It is thus reasonable to prohibit Samilow from competing and soliciting Update's customers in its own backyard. Moreover, in light of the nature of the eDiscovery and litigation support industry in which Update competes for clients, the geographic reach of the Non-solicitation covenant appropriately covers a 50-mile radius of Update's seven other offices. *See Advanced Marine Enterprises, Inc. v. PRC Inc.*, 256 Va. 106, 118–19 (upholding a restriction limited to a fifty-mile radius around former employer's 300 offices); *Roanoke Eng'g*, 223 Va. at 553 (enforcing as reasonable a restriction as to all "territory covered by" the former employer against employee with company-wide knowledge pertinent to all branch offices). Samilow's knowledge of Update's customers and customer information is not limited to the New York/New Jersey region or those customers that he personally serviced, but spanned the entire reach of Update's business locations and was national in scope during his employment. (Pish Decl. ¶¶ 12, 14–15, 17) And, in fact, by Samilow's own admission, he still "has a national practice" at the competing Samilow Harvest Group. (Compl., Ex. B). Accordingly, the geographic scope of Samilow's non-solicitation and non-compete covenants is reasonable because it is coextensive with the territories in which Update conducts business, and in which Samilow conducted business. *See, e.g., New River Media*, 245 Va. at 369 (holding that a "60-mile, 12-month limit is not unduly harsh and oppressive in diminishing [the employee's] legitimate efforts to earn a living."); *Blue Ridge Anesthesia*, 239 Va. at 372–74 (upholding a covenant limited to territories former employee serviced); *Mutual Funding*, 62 Va. Cir. 34, 2003 WL 21057572, at *2 (Va. Cir. Ct. 2002) (finding restriction of "60-mile radius from each of four cities where [the employer] has bases of operations" to be reasonable).

13

Samilow's Non-solicitation covenant also appropriately covers those customers whom he served during his employment — irrespective of any geographic limitation. (*See* Pish Decl., Ex. 1 § 12(a)("I will not solicit… or encourage others to solicit any of [Update's] customers … with whom I had any contact during the term of my employment…"). As noted, Samilow had extensive contact with Update's clients in New York and New Jersey. During his employment at Update, he specifically had contact with Porzio, Lowenstein Sandler, and Teligent — the same clients he has solicited and/or successfully diverted to his unlawful competing consulting practice at Samilow Harvest Group.

Samilow did not individually bring any of these customers to Update. (Pish Decl. ¶ 13). Rather, they were and are valuable Update customers developed over the years through Update personnel, Update financial resources, and Update marketing efforts. (Pish Decl. ¶ 15). Mr. Samilow also notably did not claim to identify any customers as a Prior Relationship customer in his Agreement; in fact, he brought no such prior relationship customers with him to Update. (Pish Decl. Ex. 1 at Ex. B).

Such narrowly tailored customer-focused covenants are routinely enforced by Virginia courts, as Virginia law does not require geographic limitations for non-solicitation agreements if they are otherwise narrowly drafted to protect legitimate business interests. *See, e.g., Preferred Systems Solutions, Inc. v. GP Consulting, LLC*, 284 Va. 382, 394 (2012) ("The lack of a specific geographic limitation is not fatal to the covenant because the noncompete clause is so narrowly drawn to this particular project and the handful of companies in direct competition with [the Company]"); *Brainware, Inc. v. Mahan*, 808 F. Supp. 2d 820, 827-28 (E.D. Va. 2011) (upholding non-solicitation covenant without geographical limitation that "expressly limits the

restriction on solicitation only to those clients who were contacted, solicited, or served by [the employee] while he was employed by [the employer]").

In addition, both the geographic and prior customer contact-based restraints in Samilow's Non-solicitation covenant are appropriately limited to those solicitations that compete with Update's business. (*See* Agreement § 12(a) (tying the covenant's prohibition to only those solicitations that are "for the purpose of diverting or taking away business from [Update]"). This proper competitive limitation in Samilow's Non-solicitation covenant was precisely what the Supreme Court of Virginia concluded was lacking in the customer restriction in *Omniplex World Services Corp. v. U.S. Investigations Services, Inc.*, 270 Va. 246, 250 (2005) (holding that the provision "precludes [the employee] from working for any business that provides support of any kind to the [customer], not only security staffing businesses that were in competition with Omniplex"). Samilow's solicitation of Porzio, Teligent, and Lowenstein Sandler for legal staffing and other eDiscovery work is directly in competition with what Update does (and with what he did for Update), and his actions either have diverted (in the case of Porzio and Teligent) or threaten to unlawfully divert other Update customers. (Pish Decl. ¶¶ 25, 30–31, 35–36).

For all these reasons, Samilow's non-solicitation and non-compete covenants are eminently reasonable to protected Update's eDiscovery and legal staffing business.

### 3. The Non-solicitation and Non-compete Covenants Do Not Unduly Restrict Samilow's Ability to Earn a Living.

Samilow will suffer no undue hardship as a result of an injunction enforcing the restrictive covenants to which he voluntarily agreed in exchange for increased compensation. Simply put, he can still work in the eDiscovery and litigation support industry, as long as he does not perform the same or similar services that he provided Update, and he complies with the terms and scope of his Non-solicitation and Non-compete covenants. Virginia courts enforce such

#56387085_v3

restrictions where the covenant does not unduly interfere with a defendant's ability to earn a living, and the Court should similarly enforce Samilow's Non-solicitation and Non-compete covenants here. *New River Media*, 245 Va. at 370; *cf. Hair Club for Men*, 2016 WL 4577019, at *5. (E.D. Va. Aug. 31, 2016) (holding non-compete sufficiently narrow under the circumstances despite that it prohibited employee from working "in any capacity for another hair replacement services company.").

   4.   **Enforcement of Samilow's restrictive covenants is not against public policy.**

Public policy favors enforcement of valid contracts. *See JTH Tax, Inc. v. Olivo*, No. 2:15-CV-345, 2016 WL 595297, at *5 (E.D. Va. Feb. 12, 2016) ("Enforcement of a valid non-compete clause aids public interest by 'preventing consumer confusion' and 'requiring parties to value the sanctity of contract.'")(quoting *JTH Tax, Inc. v. Lee*, 514 F. Supp. 2d 818, 826 (E.D. Va. 2007). There will be no injury to the public if Samilow is required to comply with his Non-solicitation and Non-compete covenant from 12 months from Samilow's latest breach. There are a sufficient number of professionals or entities providing eDiscovery, legal staffing, and litigation support services such as Samilow, so his removal from soliciting or selling to Update's customers during this limited period will have no impact on the availability of these services or competition among the providers in the industry. *See Blue Ridge Anesthesia*, 239 Va. at 373–74 (finding restriction does not offend public policy where the industry was "a wide open field with heavy competition, with multiple competing products[.]"); *Hair Club for Men*, 2016 WL 4577019 at *5 (rejecting argument that enforcement of non-compete would violate public policy by preventing the public from "choosing the cosmetologist they would like to deal with.").

   B.   **Samilow Indisputably Already Has Violated and Will Further Violate His Non-Solicitation and Non-Compete Covenants.**

#56387085_v3

As noted above, Samilow already has breached the Non-Solicitation covenant by contacting Update customers for competing services and already has unlawfully diverted wok from Update's business. When he resigned, Samilow demonstrated his clear intent to target Update's customers and transfer their business to his own "soon-to-be-formed" consulting practice. (Pish Decl. ¶¶ 24, 29). Samilow has now made good on his threat by forming a blatantly competing entity in Samilow Harvest Group and unlawfully capturing Update's existing Teligent project and diverting business from Update's Porzio's client. (*Id.* ¶ 30–31). In addition to the Teligent and Porzio unlawful solicitations that have already resulted in lost business, Samilow has also solicited Update customer Lowenstein Sandler. (*Id.* ¶ 25–26). It is additionally likely that further instances of Samilow's breaches will be uncovered during discovery.

## II.    Update Will Suffer Irreparable Harm Without a Preliminary Injunction.

In the absence of a preliminary injunction, Update will suffer further irreparable harm from the interference with its customer relationships and disclosure of its confidential customer or recruiting information. (*See* Pish Decl. ¶ 36). Samilow has already successfully competed against Update and solicited Update customers like Teligent and Porzio for competing work – work, which in the case of Porzio, has involved the identities and contacts found in Update's proprietary database. (*See* Pish Decl. ¶¶ 24–29, 30–31, 33-35). Though these unlawful acts have already caused Update to lose revenue, these injuries cannot adequately be measured or compensated by money damages. *XL Specialty Ins. Co. v. Truland*, 2014 WL 4230388, at *3 (E.D. Va. Aug. 21, 2014) ("[G]enerally irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate.") (quoting *MultiChannel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994)). Moreover,

17

Samilow expressly agreed that his breach of the Non-Solicitation and Non-compete covenants "will result in irreparable and continuing damage to [Update] for which there will be no adequate remedy at law, and [Update] shall be entitled to injunctive relief..." (Pish Decl., Ex. 1 § 17).

Virginia courts consistently hold that "loss of clients' goodwill and future business . . . [is] difficult, if not impossible, to measure fully." *Fidelity Global Brokerage Grp., Inc. v. Gray*, No. 1:10-CV-1255, 2010 WL 4646039, at *3 (E.D. Va. Nov. 9, 2010). In the Fourth Circuit, "when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994), *abrogated on other grounds by Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 12 (2008). Here, Samilow has not only diverted Update's existing client engagements, he has threatened Update's relationship with longstanding clients. This loss of goodwill and future business cannot be easily quantified, especially because Update relies on repeat engagements as a major key to its overall business strategy. (Pish Decl., ¶¶ 6–8, 36).

III.    **The Other Two Factors Strongly Support Injunctive Relief**

First, Update's interest in a preliminary injunction to protect it from the irreparable loss of its customers and confidential information pending the determination of this lawsuit far outweighs Samilow's interest in continuing to solicit and divert Update's customers for his direct competitor, Samilow Harvest Group, in violation of his Non-solicitation and Non-compete covenants. As set forth above in Section I.A.3., Samilow will suffer no harm if an injunction issues and may even continue to work for Samilow Harvest Group so long as he does not solicit, or encourage others to solicit, Update's customers, or perform the same services that he

18

performed for Update within a 50-mile radius of Update's offices during the limited 1-year period.

Second, enforcement of the reasonable, mutually agreed-upon restrictive covenants — for which Samilow received substantial consideration — would advance the public's interest in protecting the validity of enforceable contracts. *See, e.g., Moller-Maersk A/S v. Escrubs Sys., Inc.*, No. 1:07-cv-1276, 2007 WL 4562827, at *4 (E.D. Va. Dec. 21, 2007) ("Failure to grant a TRO and thereby inhibit further contract breach is harmful to the public's ability to rely on contract agreements."). "Enforcement of a valid non-compete clause aids public interest by 'preventing consumer confusion' and 'requiring parties to value the sanctity of contract.'" *JTH Tax, Inc. v. Olivo*, No. 2:15-CV-345, 2016 WL 595297, at *5 (E.D. Va. Feb. 12, 2016) (quoting *JTH Tax, Inc. v. Lee*, 514 F. Supp. 2d 818, 826 (E.D. Va. 2007).

**IV.    No Bond Should Issue.**

Because the requested injunction merely restores the contractual rights of the parties and Samilow may continue to work at Samilow Harvest Group in a non-competing role, he will suffer no harm from the injunction and thus the Court should waive any bond. *See Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) (acknowledging that a district court can waive a bond); *see also US Airline Pilots Assoc. v. Velez*, 2015 WL 5258725, at *7 (W.D.N.C. Aug. 27, 2015) (waiving the bond because there was "little to no risk that Defendants would be harmed as a result of an improvidently issued injunction").

CONCLUSION

Based on the foregoing, Plaintiff Update, Inc. respectfully requests that the Court grant its motion and enter an Order that preliminarily enjoins Defendant Samilow, directly or indirectly, individually or through Samilow Harvest Group or other parties, from: (a) providing any future

19

competing services, for the restricted 1-year period, to Porzio, Teligent or other customers or

entities that are the same or similar to those services that Samilow performed at Update; (b)

further soliciting or encouraging others to solicit, for the restricted 1-year period, Porzio,

Teligent and any other Update customer or prospect with whom Defendant Samilow had contact

for the purpose of diverting or taking away business from Update; and (c) accessing or using any

Update confidential information, including but not limited client information or lists of contacts

of potential legal staffing candidates.

April 20, 2018                                  Respectfully submitted,


                                                */s/ Brandon H. Elledge*
                                                Brandon H. Elledge (VSB No. 45349)
                                                Kevin D'Olivo (VSB No. 90655)
                                                HOLLAND & KNIGHT LLP
                                                1650 Tysons Boulevard
                                                Tysons Corner, Virginia  22102
                                                (703) 720-8015
                                                Fax: (703) 720-8610
                                                brandon.elledge@hklaw.com
                                                kevin.dolivio@hklaw.com

                                                *Counsel for Plaintiff Update, Inc.*

#56387085_v3

# CERTIFICATE OF SERVICE

I certify that on this 20th day of April, 2018, a true and correct copy of the foregoing was

sent out for personal service on:

Lawrence Samilow
1404 Drum Hill Road
Martinsville, NJ 08836

*Defendant*

*/s/ Brandon H. Elledge*
Brandon H. Elledge (VSB No. 45349)
HOLLAND & KNIGHT LLP
1650 Tysons Boulevard
Tysons Corner, Virginia 22102
(703) 720-8015
Fax: (703) 720-8610
brandon.elledge@hklaw.com

*Counsel for Plaintiff Update, Inc.*

#56387085_v3